LYNCH, Chief Judge,
dissenting.
With respect, I dissent. Because the award rests on errors of law, I would reverse.
The Equal Access to Justice Act (“EAJA”), 28 U.S.C. § 2412(d)(1)(a), must be construed in favor of the United States. Ardestani v. INS, 502 U.S. 129, 137, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991). The Act requires a court to award fees and expenses to a prevailing party in a civil *49 action against the United States unless the court finds that the position of the United States was substantially justified, or that special circumstances make an award unjust. 28 U.S.C. § 2412(d)(1)(a). The purpose of the Act was to “ensure that certain individuals ... will not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved.... The Act reduces the disparity in resources between individuals ... and the federal government.” H.R. Rep. 99-120(1), at 4 (1985), U.S.Code Cong. & Admin.News 132, 132-33; see also Scarborough v. Principi, 541 U.S. 401, 407, 124 S.Ct. 1856, 158 L.Ed.2d 674 (2004).[21]
I disagree with the majority’s reasoning on both prongs of the EAJA analysis. This result contravenes the purposes of the Act. It imposes on United States Citizenship and Immigration Services (“US-CIS”) the costs of plaintiffs attorneys’ fees when the agency at all times acted in accordance with the law. It also imposes such costs on the agency for attempting to resolve the matter by agreement and withdrawing the issue from the court and back to the agency so that the agency could give the relief the plaintiff sought. It also has the practical effect of draining resources from an agency which is already struggling to do its job.
I.
In my view, plaintiff is not a prevailing party. A party is prevailing for EAJA purposes if there is a material alteration in the party’s position that bears a “judicial imprimatur.” Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep’t of Health & Human Res., 532 U.S. 598, 604-05, 121 S.Ct. 1835, 149 L.Edüd 855 (2001). In Buckhannon, the Supreme Court noted two specific ways in which a party can prevail: by obtaining a judgment on the merits or a consent decree in its favor. Id. at 605, 121 S.Ct. 1835. Other circuits have read Buckhannon as allowing parties to prevail if they receive the equivalent of a consent decree or some other form of judicial relief that both affects a material alteration and bears a judicial imprimatur. See Smith v. Fitchburg Pub. Sch., 401 F.3d 16, 23-24 (1st Cir.2005). This circuit has not taken a position on the issue. Id. at 23.
The majority focuses on the first situation, asking “whether the district court’s order was the functional equivalent of a consent decree.” The majority distinguishes this circuit’s decision in Smith on the ground that Smith was not concerned with whether the orders in question were the equivalent of a consent decree. However, as in Smith, here the question of whether the order was the equivalent of a consent decree was not raised by either party, nor was that the theory on which the district court relied. Thus the issue was waived. Id. at 24 (the issue is waived if not presented by the parties). Instead, the parties and district court focused on the second situation: whether the district court’s order put the necessary judicial imprimatur on the change in Aronov’s legal status. The majority should not create arguments the parties and the district court did not use, nor do so to justify its result.
*50 But even if the issue had not been waived, the district court’s brief order remanding the case is not the equivalent of a consent decree. The order contains no statement incorporating an agreement between the parties or requiring that either party act in a particular way. All the order does is to remand the case at the request of the agency. The order here thus differs from the ones cited by the majority which other circuits have found to be the functional equivalent of consent decrees. See, e.g., Carbonell v. INS, 429 F.3d 894, 897 (9th Cir.2005) (district court incorporated parties’ stipulation into an order); Truesdell v. Phila. Hous. Auth., 290 F.3d 159, 162 (3d Cir.2002) (district court order included detailed terms of parties’ settlement); Am. Disability Ass’n v. Chmielarz, 289 F.3d 1315, 1317 (11th Cir.2002) (parties’ settlement was “approved, adopted, and ratified” by the district court in an order where the court expressly retained jurisdiction).
As the Supreme Court has made clear, the distinction is material: “The situation would be quite different if the parties’ obligation to comply with the terms of the settlement agreement had been made part of the order.... ” Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). It is quite clear that a “judge’s mere awareness and approval of the terms of the settlement agreement do not suffice to make them part of his order.” Id.
I would hold that the district court’s order lacks the necessary judicial imprimatur to entitle Aronov to prevailing party status. Our circuit precedent in Smith requires that result. The majority’s treatment of the order as the functional equivalent of a consent decree is inconsistent with our holding in Smith.[22] That case involved an administrative hearing officer’s pre-hearing orders, some of which were accompanied by the threat of sanctions, which “memorialized the voluntary concessions made by [defendant] and attempted to keep the settlement process moving forward in a timely manner.” Smith, 401 F.3d at 26. We held that these orders, although they imposed specific requirements on defendant, did not have sufficient judicial imprimatur to make plaintiff a prevailing party because they simply made defendant “follow through with what [defendant] had already voluntarily promised to do.” Id. at 27. That is exactly the case here. The district court’s remand permitted USCIS to follow through with its announced intention to make Aronov a citizen by November 8, 2006. USCIS had voluntarily agreed to do so before it requested the remand. As in Smith, the remand may have kept the process moving in a timely manner, but that is not enough to make Aronov a prevailing party. His claim under the EAJA should have stopped there.
II.
I also disagree with the majority that the government’s pre-litigation position was not substantially justified.
The Supreme Court has interpreted the “substantially justified” language in the EAJA: “[A]s between the two commonly used connotations of the word ‘substantially,’ the one most naturally conveyed by the phrase before us here is not ‘justified to a high degree,’ but rather ‘justified in substance or in the main’ — that is, justified to a degree that could satisfy a reasonable person.” Pierce v. Underwood, 487 U.S. *51 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); see also, e.g., Schock v. United States, 254 F.3d 1, 5 (1st Cir.2001); Dantran, Inc. v. U.S. Dep’t of Labor, 246 F.3d 36, 40-41 (1st Cir.2001). The government’s position is substantially justified if required by law. See Dantran, 246 F.3d at 41; United States v. One Parcel of Real Prop. With Bldgs., 960 F.2d 200, 208-09 (1st Cir.1992). That was true here.
The government’s position may be substantially justified even if its reasonable interpretation of its legal obligations is not ultimately affirmed by a court. Schock, 254 F.3d at 5. This court earlier reversed a district court for abuse of discretion in granting attorneys’ fees when the government “was at least reasonable” in denying a visa because it wanted to “communicate the attitude of the United States government toward the activities of the Soviet Union,” even though the visa applicant’s interpretation of the underlying law ultimately prevailed. Allende v. Baker, 891 F.2d 7, 12, 13 (1st Cir.1989); see also, e.g., Li v. Keisler, 505 F.3d 913, 920 (9th Cir. 2007) (“In the absence of guidance from this court, the government’s position was substantially justified.”); Bricks, Inc. v. U.S. EPA, 426 F.3d 918, 924 (7th Cir.2005) (although EPA was unsuccessful in its attempt to show a hydrological connection, it was still substantially justified in doing so).
Here, the government argues that US-CIS’s pre-litigation position was substantially justified because that position was taken pursuant to federal law. In particular, the government points to two congressional enactments with which it has complied here. The first is 8 U.S.C. § 1446(a), which provides that “[bjefore a person may be naturalized, an employee of the [US-CIS], or of the United States designated by the Attorney General, shall conduct a personal investigation of the person applying for naturalization.” The second is language included by Congress in the 1998 Appropriations Act which has continuing effect: “[DJuring fiscal year 1998 and each fiscal year thereafter, none of the funds appropriated or otherwise made available to [USCIS] shall be used to complete adjudication of an application for naturalization unless [USCIS] has received confirmation from the Federal Bureau of Investigation that a full criminal background check has been completed.... ” Dep’ts of Commerce, Justice & State, The Judiciary & Related Agencies Appropriations Act, 1998, Pub.L. 105-119, 111 Stat. 2440, 2448-49 (1997) (8 U.S.C. § 1446 note) (emphasis added).
The majority faults USCIS for interpreting the phrase “full criminal background check” to include a FBI name check. In the end, the award here turns on the majority’s view that USCIS did not need to include the FBI name check as part of a “full” check, and that the agency’s compliance with its name check policy renders its pre-litigation position here (to await the results of a requested name check) not substantially justified. But the agency’s policy and its pre-litigation decision to comply with its policy were entirely reasonable.
The question before us is not whether the language in 8 U.S.C. § 1446 and the 1998 Appropriations Act specifically requires that FBI name checks be part of the background check on citizenship applicants, but whether the agency’s interpretation of these statutes as requiring FBI name checks to fulfill its statutory responsibilities renders its position not substantially justified. The position is substantially justified because it was a reasonable interpretation of a legislative command[23] *52 and that interpretation was committed to the agency’s expertise.
Principles of administrative law require that courts defer to reasonable interpretations by agencies of matters committed to the agency’s expertise by Congress. Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); Global Naps, Inc. v. Verizon New England, Inc., 505 F.3d 43, 47 (1st Cir.2007). Agencies are also entitled to deference with respect to policy determinations. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Global Naps, 505 F.3d at 47; Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir.1997) (“[P]olicy choices are for the agency, not the court, to make. Even if a reviewing court disagrees with the agency’s conclusions, it cannot substitute its judgment for that of the agency.”). We also note that we are describing .a consistent USCIS interpretation and practice, not one adopted for purposes of the issues in this attorneys’ fees litigation.
USCIS, not the majority, has the expertise to determine what should constitute a full criminal background check. The concern that applicants be adequately vetted before they become citizens has taken on added urgency in an age where terrorism is a reality and a continuing threat. That the agency came to decide in 2002 that the inclusion of FBI name checks provided better full criminal background investigations only undercuts the majority’s position.
The majority holds that although a court might ordinarily defer to USCIS’s policy of using FBI name checks to fulfill its statutory mandate to complete background investigations on citizenship applicants, here we cannot do so because the agency contravened 8 U.S.C. § 1447(b). The statute permits a citizenship applicant to file suit in federal district court if USCIS fails to adjudicate his application within 120 days of conducting an initial examination. The majority places great weight on this provision, treating it as a “statutory mandate” that the agency must adjudicate an application within 120 days of an initial examination. That is plainly not what the statute says. It says only that suit may be brought within 120 days of the examination.
The provision’s legislative history discusses the importance of eliminating delays but says nothing about imposing a deadline on the agency, only that after 120 days relief can be sought in federal court. See 135 Cong. Rec. H4539-02, 4542-43, 1989 WL 182156 (daily ed. July 31, 1989). Thus the authorization to file suit in district court is meant to encourage the agency to act fast, but that does not mean that Congress meant to impose a strict deadline on the agency. Indeed, if Congress wanted to impose a strict deadline, it could have done so directly. It is true that the agency’s regulations suggest that it treat the 120-day provision as an internal deadline, see 8 C.F.R. § 335.3(a), but that does not create a “statutory mandate.” The statute simply governs the timing of suits.[24]
*53 Corresponding with its view that 8 U.S.C. § 1447(b) creates a mandate, the majority suggests that the government would have to make a very strong showing in order to justify missing the 120-day mark. It also faults the government for not advancing a “particularized justification” regarding Aronov and why a name check was necessary for him. In my view both rationales are wrong on their own terms and both miss the point.
Even reading the statute as imposing a deadline on the agency, the majority is nonetheless wrong because there is nothing to say that 8 U.S.C. § 1447(b) was meant to trump the agency’s obligations to see that an applicant meets the requirements for citizenship or to trump the agency’s mandate to conduct a full criminal background check.
Here the agency made a mistake by conducting Aronov’s initial examination before it had completed his background investigation, including obtaining the results from the FBI of his name check.[25] Bureaucracies make mistakes. Given this mistake, the relevant question is whether it was unreasonable for the agency to proceed with the name check even though doing so meant that Aronov could pursue relief in federal court because of the 120-day provision.
I would hold that it was not unreasonable for USCIS to miss the 120-day mark in order to complete a name check before granting Aronov citizenship. No “particularized justification” is necessary because the entire point of conducting name checks is that the government does not know what the check will uncover. As USCIS has stated,
Although these security checks may require a more lengthy processing time, USCIS believes that performing them is essential to identifying national security and public safety concerns that would not have been uncovered by other means. This is particularly true given that in[] a few cases, the information obtained from the FBI through this process has reflected very significant issues and risks. FBI name checks disclose information to USCIS that is otherwise not available.... USCIS is committed to effective background checks, and thus is committed to the FBI name check.
USCIS, Response to the Citizenship and Immigration Services Ombudsman’s 2006 Report, at 10, available at http://www.dhs. gov/xlibrary/ assets/USCIS-Response-Ombudsman-06-Report-May-2007.pdf.
Moreover, as the majority points out, although USCIS recently eliminated the name check requirement for visa applicants in order to lessen its backlog, it has not done so for citizenship applicants for the very sensible reason that once a person is granted citizenship, that decision is not easily reversed. There is nothing unreasonable about USCIS’s decision to postpone a decision on Aronov’s application for citizenship until obtaining information about whether the name check revealed risks to national security or public safety, even if doing so meant that a decision could not be reached within 120 days of his examination.
*54 Indeed, the ease law also provides no basis for the award here. USCIS’s pre-litigation position in this case bears no resemblance to pre-litigation positions that courts have found not to be substantially justified. In Healey v. Leavitt, 485 F.3d 63 (2d Cir.2007), the Second Circuit held that the government’s pre-litigation position was not substantially justified when the government “failed to offer any justification for the Secretary’s failure to require [home health agencies] to provide written notice of the termination of benefits.” Id. at 67. Here the agency points to statutes forbidding it to grant citizenship before certain actions are taken. In Sierra Club v. Secretary of Army, 820 F.2d 513 (1st Cir.1987), this court held that an agency’s refusal to prepare an environmental impact statement for a project was unreasonable when there was significant evidence that the project required one and several other federal agencies had advocated for one and warned that one might be legally required. Id. at 519-20 (citing Sierra Club v. Marsh, 769 F.2d 868, 874-75 (1st Cir.1985)). Here, the agency did not act contrary to law, but according to its reasonable interpretation of the law.
III.
The majority opinion will, in my view, have a number of unfortunate consequences. The majority holds that the government, by acting reasonably and requesting a remand so that it could grant Aronov citizenship, exposed itself to liability under the EAJA because Aronov necessarily became a prevailing party once the court granted the remand. This will discourage USCIS from acting to resolve these cases in a similarly efficient and amicable way in the future. The majority also says that it would be very difficult for the government to show that it was substantially justified in missing the 120-day mark to act on a citizenship application. The majority would thus discourage US-CIS from conducting investigations of applicants that could turn up important information but would require longer than 120 days after the applicant’s examination for the agency to make a final determination. Ultimately the decision could be contrary to the interests of applicants because in the face of incomplete information, the agency might choose the safer course of denying citizenship.
I respectfully dissent.

. See also 131 Cong. Rec. S9991-02, 1985 WL 715613 (daily ed. July 24, 1985) (statement of Sen. Grassley) (noting that the purpose of the Act was to prevent "meritless” government action); id. (statement of Sen. DeConcini) ("Before the [EAJA], small businesses, faced with unjustified Federal agency actions, were confronted with a difficult choice — to comply without question to Government regulatory enforcement which they believed improper, or challenge the Government, often at a cost exceeding the fine or penalty imposed.”).

. The majority also suggests that Smith is somehow different because the orders in question came from an administrative hearing officer rather than a district court, but Smith lends no support to that proposition.

. The majority says that the government has presented no argument that Congress intended that USCIS use the FBI name check. That reasoning puts the cart before the horse. The *52 broad language used by Congress lets the agency determine how best to perform a full criminal background check and does not limit the agency to a particular type of check. There is no evidence, textual or otherwise, that Congress intended to require the agency not to use FBI name checks.

. Additionally, the cases the majority cites for the proposition that the statute creates a deadline involved different questions. United States v. Hovsepian, 359 F.3d 1144 (9th Cir.2004), was concerned with the question of whether exclusive jurisdiction rests in the district court after 120 days, and it provided no analysis or support for its observation that *53 § 1447(b) “requires the INS to make a decision ... within 120 days.” Id. at 1161. Walji v. Gonzales, 500 F.3d 432 (5th Cir.2007), involved the question of when the 120-day period begins to run and used the language "the statute is violated in situations such as [petitioner's]” in the context of supporting its con-elusion that the 120-day period applies from the time the examination, and not the entire background check, is completed. Id. at 439.

. There is no question that doing so was an error. See 8 C.F.R. § 335.2(b).